UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

---

Jane Doe 186, by and through her parents and guardians, Mother Doe 186 and Father Doe 186, and on their own behalves,

        Plaintiffs,

vs.

Shawn Ratigan, Diocese of Kansas City – St. Joseph, and Bishop Robert Finn,

        Defendants.

Case No.

**COMPLAINT**

---

Plaintiffs, for their Complaint against Defendants allege:

## PARTIES

1. Plaintiff Jane Doe 186 is a minor female citizen and resident of the State of Missouri, who brings this lawsuit through her parents and guardians, Plaintiffs Mother Doe 186 and Father Doe 186, who are also citizens and residents of the State of Missouri. The parents act on their own behalf as well as on behalf of their child. The true identity of Plaintiff and her guardians is being withheld from the public record on the grounds that Plaintiff Jane Doe 186 is a minor and a victim of the sex crimes described herein. The Defendants will be informed of their identities.

2. Defendant Diocese of Kansas City – St. Joseph ("Diocese") is a non-profit corporation authorized to conduct business and conducting business in this State with its principal place of business located at The Catholic Center, 20 West Ninth Street, Kansas City, Missouri 64105. Defendant Bishop Robert Finn is an individual adult male resident of the State of Missouri. At all material times, Defendant Finn was the head of the Diocese of Kansas City –

St. Joseph.

3. Defendant Father Shawn Ratigan is a Roman Catholic Priest and a resident of the State of Missouri. At all material times, Defendant Ratigan remained under the direct supervision, employ, and control of Defendants Bishop Finn and the Diocese.

**JURISDICTION**

4. Plaintiffs brings this Complaint under federal question jurisdiction under authority of 28 U.S.C.A § 1331, pursuant to federal laws 18 USC §§ 2(a), 2251, 2252A, 2255, and 2259.

**FACTS OF ABUSE BY DEFENDANT RATIGAN**

5. On June 4, 2004, Defendant Ratigan was ordained as a Roman Catholic Priest in the Diocese of Kansas City-St. Joseph. The Diocese held out Defendant Ratigan as a qualified priest and pastor.

6. Defendant Ratigan's first assignment, in 2004, was as an associate pastor at St. Thomas More Parish in Kansas City, Missouri. In June 2005, the Diocese concurrently assigned Defendant Ratigan as pastor of St. Mary's Parish in St. Joseph, Missouri and St. Joseph's Parish in Easton, Missouri. Defendant Ratigan pastored both parishes from June 2005 to July 2009. During that same time period, Defendant Ratigan served as Chaplain for Bishop LeBlond High School in St. Joseph.

7. In 2006, Plaintiff Jane Doe 186 and her family met Defendant Ratigan at the funeral mass for Plaintiff Jane Doe 186's great grandfather. Defendant Ratigan officiated at the funeral in his role as Pastor of St. Mary's Parish. Subsequently, Defendant Ratigan would appear at Cathedral School of St. Joseph where Plaintiff was a student. Defendant Ratigan would often stop by and visit with the family. These visits occurred from approximately 2006 through 2011.

8. Beginning in approximately 2008, Defendant Ratigan took photographs and visual images of the minor Plaintiff while she was wearing her bathing suit. The images focus on the vaginal and buttock areas of the minor Plaintiff. These photographs and images depict sexually explicit conduct. Said photographs and images constitute child pornography under 18 U.S.C. § 2256.

9. Beginning in approximately 2009, Defendant Ratigan took photographs of the minor Plaintiff while she was fully clothed and sleeping. The photographs show that Plaintiff's position was moved by Defendant Ratigan while sleeping in order to pose Plaintiff in a sexually suggestive manner. The photographs are sexual in nature and depict sexually explicit conduct. Said photographs and images constitute child pornography under 18 U.S.C. § 2256.

10. Upon information and belief, Defendant Ratigan uploaded the sexually explicit images to his computer and Defendant Ratigan distributed over the Internet the sexually explicit images of the minor Plaintiff.

11. The computers that Defendant Ratigan used to process, store and distribute the child pornography of the minor Plaintiff Jane Doe 186 were manufactured outside the State of Missouri and said computers were mailed, shipped or transported into Missouri through means of interstate or foreign commerce, or means affecting interstate or foreign commerce.

12. The cameras that Defendant Ratigan used to photograph and create the child pornography were manufactured outside the State of Missouri and said cameras were mailed, shipped or transported into Missouri through means of interstate or foreign commerce, or means affecting interstate or foreign commerce.

13. The discs and other storage media used by Defendants to store the child pornography described herein were manufactured outside the State of Missouri and said discs

and other storage media were mailed, shipped or transported into Missouri through means of interstate or foreign commerce, or means affecting interstate or foreign commerce.

**FACTS OF DIOCESAN DEFENDANTS' RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY OF PLAINTIFF JANE DOE 186**

14. In July 2009, the Diocese re-assigned Defendant Ratigan as Pastor of St. Patrick's Parish and School in Kansas City, North. He was simultaneously assigned as Chaplain of St. Pius X High School.

15. On December 16, 2010, the St. Patrick's parish computer contractor Ken Kes performed maintenance on Defendant Ratigan's laptop computer, at the request of Defendant Ratigan.

16. Service by Kes on the Ratigan laptop was within his contract with the Diocese.

17. While servicing the computer, Kes discovered files containing pictures of young girls, which focused on the torso and crotch areas of the children. Kes did not turn the computer over the police but, because of his contract with the Diocese, returned the computer to Deacon Lewis at St. Patrick's parish.

18. On information and belief, Kes informed Deacon Lewis of his discovery that Defendant Ratigan's computer contained files of pictures of young girls sufficient to cause Kes to make inquiry about turning the computer over to police. The injuries were those of Plaintiff Jane Doe 186 as well as a number of other girls.

19. Kes showed Deacon Lewis at least one photo he discovered with a young girl in a diaper, with the diaper pulled away to expose the girls' genitals.

20. So as to dissuade Kes from turning the computer over to the police, Deacon Lewis advised Kes that Deacon Lewis would take care of the computer and turn it over to the proper

4

authorities.

21. Kes was not directed by the Diocese not to communicate with the police. But by Deacon Lewis assuring Kes that the Diocese would do so, the Diocese was implicitly informing Kes that Kes no longer had any independent responsibility for acting appropriately as to the Ratigan computer, and that Kes was relieved of the burden to make a report to police.

22. In his communications with Kes, Deacon Lewis intended Kes to conclude he no longer had a duty to act as to the Ratigan computer, and in fact Kes made no report about the Ratigan computer.

23. By Deacon Lewis's communications with Kes, the Diocese acted so as to continue to conceal the contents of the Ratigan computer, and to keep Kes from making any other disclosure about the contents of the Ratigan computer.

24. Instead of acting as he had assured Kes he would, that he would turn the computer over to proper authorities, who would include the police, Deacon Lewis immediately called only Vicar General, Monsignor Murphy.

25. Msgr. Murphy is the highest ranking officer in the Diocese after Bishop Robert Finn. His duties include handling complaints and personnel issues involving priests, including serving as administrator of the Response Team for investigating sexual abuse of minors. He also works with the Independent Review Board, which makes recommendations to the Bishop regarding findings of sexual abuse of minors.

26. Msgr. Murphy called Kansas City Police Department Captain and Independent Review Board member Rick Smith. Msgr. Murphy solicited advice from Smith based on Msgr. Murphy's vague description of only one of the many pornographic photographs present on Defendant Ratigan's computer, as compared to the hundreds of such images of child

5

pornography that existed on the computer. Msgr. Murphy never showed the photo to Capt. Smith.

27. Msgr. Murphy made no formal report to Smith. His call to Smith was an informal means of getting information. Murphy intended any information he obtained from Smith to be used to evade as much as possible any responsibilities the Diocese had to report the Ratigan computer contents, to conceal as long as possible the contents of the Ratigan computer, to plan ways to destroy the Ratigan computer, and to build as much as possible an artifice behind which the Diocese could claim it acted innocently. In other words, the Diocese began from the inception to plan how to justify its own conduct to assist Ratigan in concealing the Ratigan computer rather than act as a responsible citizen.

28. In his description to Smith, Msgr. Murphy also added a false and misleading detail about the single photograph he elected to vaguely describe: that the photograph was a photograph of a family member or a niece of Defendant Ratigan.

29. In fact, Msgr. Murphy had no information that the photograph was of any relative to Defendant Ratigan. That detail was invented by Murphy.

30. The purpose of Msgr. Murphy (a) making only a vague description of a single photograph, as opposed to providing Mr. Smith with a fair description of the pornographic images on Defendant Ratigan's computer, and (b) falsely describing the single photograph as that of a family member, was to elicit from Smith a tepid response, which the Diocese desired, that would enable Murphy to later claim he had "investigated" Defendant Ratigan while enabling the Diocese to maintain secrecy of their employee's child pornography for as long as possible, to justify not immediately turning the Ratigan computer over to police, and to minimize the possibility that Smith would demand the Ratigan computer immediately.

Case 4:11-cv-00957-GAF   Document 1   Filed 09/22/11   Page 6 of 19

31. When Msgr. Murphy was told by Defendant Ratigan that Ratigan had no idea who the child in the photograph was, Murphy made no attempt to communicate again with Captain Smith to clarify his misleading detail. Murphy did not do so in order to avoid getting information he did not want and the Diocese did not want, information that might interfere with the plan by the Diocese to minimize and conceal the child pornography on its employee's computer. Murphy also withheld that clarification from Smith so that Smith would delay demanding the Ratigan laptop as the source of evidence of a crime.

32. Subsequent to these conversations, Deacon Lewis delivered the Ratigan computer not to police but to Msgr. Murphy. After receiving the Ratigan computer from Deacon Lewis, Msgr. Murphy turned it over not to police but to the Diocesan Director of Management Information Systems, Julie Creech.

33. Creech searched the computer and found, as had Kes, that it held hundreds of photographs of young children, primarily girls. These photos contained pictures of young girls who were naked and also pictures of girls that while clothed, were taken by Creech to be sexual in nature. Creech also discovered a file marked "------." This file contained a group of staged photos of a young girl, two to three years old. These images showed the girl's exposed genitals.

34. Ms. Creech found other files that she also felt were sexual in nature.

35. On the evening of December 16, 2010, Creech spoke with Msgr. Murphy about her discovery of hundreds of images of child pornography, and advised him to call the police.

36. Msgr. Murphy did not call the police as advised by Ms. Creech.

37. Communications Director Rebecca Summers also spoke with Msgr. Murphy about the child pornography images on the Ratigan computer, and advised Msgr. Murphy to call the police. Msgr. Murphy informed Summers that he planned to consult with a police officer

7

about the photos.

38. Msgr. Murphy did not consult with a police officer, as he assured Summers he would. Upon information and belief, he consulted instead with Bishop Finn about the photographs on the Ratigan computer.

39. Msgr. Murphy had no such plan to consult with a police officer now that he had "too much" information about the child pornography on the computer of an employee of the Diocese. His expression of intention to Summers was false.

40. Msgr. Murphy falsely stated his intention to Summers so as to dissuade Summers from making her own report to police, and to relieve her of any sense of obligation to report.

41. Msgr. Murphy later represented to Summers that he had communicated with the police, omitting that he had communicated with police only before talking to her, not afterwards.

42. Msgr. Murphy falsely stated to Summers his police communication so as to dissuade Summers from making her own report to police, and to relieve her of any sense of obligation to report.

43. Dissuading each of Kes, Creech, and Summers from independently reporting their knowledge to police was in furtherance of the approach approved by Defendant Finn and the Diocese to evade, conceal, and destroy as much evidence as possible, but without doing so in any manner that would be too obvious.

44. The plan approved by Finn and the Diocese was to evade, conceal, and destroy evidence only by sophisticated means that might create the appearance that Defendants, including Ratigan, were incompetents. In furtherance of the plan to show themselves as sophisticated incompetents, the Defendants enlisted third parties and agents to further and make as artful as possible their intentional deceptions.

8

45. By Msgr. Murphy's communications with Summers, the Defendants acted so as to continue to conceal the contents of the Ratigan computer, and to keep Summers from making her own disclosure about the contents of the Ratigan computer.

46. Msgr. Murphy did not call the police, as he was repeatedly advised to do by the Creech and Summers. Nor was any communication made to state officials charged with the welfare of children. Neither Finn nor Murphy made any such communications in order to avoid the Defendants having to disclose the child pornography on the Ratigan computer, and to avoid actually making the report to proper authorities Murphy had assured Kes, then Summers, he would undertake.

47. Acting as Murphy knew Ratigan, Finn, and the Diocese desired; Murphy lied to Kes, lied to Creech, lied to Summers, withheld information from Smith, and affirmatively lied to Smith, among others.

48. Had Murphy called the police, a "proper authority" to call, as Murphy repeatedly assured people he would, it would have interfered with Defendant Finn's plan for the Diocese to minimize and conceal for as long as possible the child pornography on its employee's computer, and would prolong the period in which that computer might be destroyed with plausible deniability that they were incompetents rather than intentionally assisting Ratigan, as they were.

49. Neither Bishop Finn nor Msgr. Murphy informed the police, as each had been advised to do.

50. Instead of reporting this information to law enforcement, the Diocese adopted a plan to assist Ratigan in concealing his receipt and distribution of child pornography. The first step in that plan was to copy the information on Defendant Ratigan's laptop, so to as create a set of images independent of the Ratigan computer.

51. The Diocese, directed by Bishop Finn, made digital and/or physical copies of the child pornography of Plaintiff Jane Doe 186, as well as the other girls, found on Defendant Ratigan's computer. Specifically, on December 17, 2010, as directed by the Diocese, Creech downloaded and copied the pornographic material to a flash drive.

52. Copying the images was part of the plan by the Diocese, and the individual Defendants, to conceal the Ratigan computer contents to the extent that the copy would contain less information about the images than would the existing computer. While the images would be the same in the copy, working with only a copy would enable no inquiry into the internet communications made with the Ratigan laptop using those images.

53. The Defendants by this method took a step that would later enable evidence related to how the information was communicated by internet to be destroyed, even while Defendants disclaimed destroying evidence.

54. On December 17, 2010, Creech and her supervisor Paula Moss, Vice-Chancellor for Stewardship and Development, met to review the computer. Creech and Moss prepared a memorandum to Msgr. Murphy outlining the contents of the computer. Creech and Moss printed out a few of the most egregious photos and attached them to the memo. They delivered the memo to Msgr. Murphy that day.

55. Msgr. Murphy reviewed the Creech and Moss memorandum on December 17, 2010.

56. Later that day, in response to the Creech and Moss memorandum, Msgr. Murphy had another conversation with Bishop Finn regarding the situation with Defendant Ratigan's computer. The photos from the computer were either shown to or described to Bishop Finn.

57. Neither Msgr. Murphy nor Bishop Finn called the police about Defendant

Ratigan's laptop contents.

58. Instead, on December 17, Msgr. Murphy contacted Diocesan legal counsel Jon Haden. Msgr. Murphy provided him with the Ratigan laptop, the memorandum from Creech and Moss, and the attached photos. Mr. Haden retained possession of the laptop, flash drive, and a copy of the memorandum and pictures.

59. Mr. Haden made no forensic copy of the Ratigan computer hard drive. A forensic copy could have been made for a very modest expense.

60. The purpose of turning the material over to counsel was to assist the Diocese in continuing to conceal the Ratigan computer. Turning it over to counsel was an effort to cloak the Ratigan computer in the attorney-client privilege, and possibly to further shield it from disclosure to proper civil authorities, while disclaiming any intention to conceal it.

61. The Diocese and Defendant Finn then arranged to dispose of the Ratigan computer so as to eliminate all record of the receipt and distribution of child pornography.

62. Defendant Finn invented a request from Ratigan's family members for the Ratigan computer. Such a request did not exist.

63. Counsel for the Defendants was asked to return the Ratigan computer to his clients, Defendants Diocese and Finn, for the purpose of giving the Ratigan computer to the Ratigan family pursuant to the fictitious request of the Ratigan family that Finn had invented.

64. Counsel for Defendants complied, providing the Diocese and Finn the false, but reassuring, information that evidence would not be destroyed when Defendants Diocese and Finn gave the Ratigan family the Ratigan computer that the Ratigan family had not requested. This was used, as counsel knew it would be, by the Diocese and Finn to justify destroying the Ratigan computer.

11

65. As planned by Finn and the Diocese, the Ratigan family destroyed the Ratigan computer. Finn and the Diocese intended the Ratigan family would destroy the computer, thereby destroying the evidence of the receipt and distribution of the child pornography it contained.

66. Defendants also provided the Ratigan computer to the Ratigan family so that by the time law enforcement got involved, and acted to seize the Ratigan computer, the internet records contained on the computer would be unavailable.

67. All actions taken by Defendants and their agents were taken so as to destroy evidence, but in a manner so as to enable the Defendants to disclaim any intention to destroy evidence. These efforts at deception were aided by others.

68. Specifically, Bishop Finn made the decision to return the laptop to the Ratigan Family rather than to preserve it or to first make a forensic copy of the hard drive. The Diocese directed counsel to return the Ratigan laptop to the Diocese. Counsel complied with the directive to return the Ratigan laptop.

69. At no point was a forensic copy made of the Ratigan laptop hard drive.

70. Defendants then gave the Ratigan laptop to a Ratigan family member. The family of Defendant Ratigan subsequently destroyed the computer.

71. On information and belief, at no point was the family of Defendant Ratigan advised, by the Diocese or any of its agents, that it held in the Ratigan computer the only record of that laptop's internet communications, and how that laptop's images were received, distributed, or reproduced.

72. The Diocese and Finn withheld that information from the Ratigan family, so as to increase the possibility that the Ratigan family would destroy the Ratigan computer, eliminating

12

precisely the evidence the Defendants desired to eliminate.

73. The Diocese, however, retained the child pornography it downloaded from Fr. Ratigan's computer. It did not turn the material over to police at that point.

74. The Diocese and Defendant Bishop Finn possessed the child pornography of Plaintiff Jane Doe 186, as well as a number of other girls, for approximately six months in order to conceal the images and photographs from law enforcement to protect the Defendants Diocese, Ratigan and Finn from scandal, but without being perceived as executing a plan to do so.

75. Only after the laptop was destroyed did the Diocese again communicate with the police.

76. On May 11, 2011, Msgr. Murphy, once again spoke with Capt. Smith. This time Msgr. Murphy informed Smith that there were hundreds of photos on the laptop. Capt. Smith observed that was not what Msgr. Murphy had told Smith before, and Smith advised Msgr. Murphy that he must turn over to the police the Ratigan computer. Capt. Smith gave Msgr. Murphy until that afternoon to arrange the production of the Ratigan computer.

77. Msgr. Murphy again affirmatively lied to Capt. Smith and misled him into believing Msgr. Murphy would procure the Ratigan computer for Capt. Smith. In fact, Msgr. Murphy had no such intention.

78. On May 12, 2011, Capt. Smith notified the Crimes Against Children Division because he had not heard from Msgr. Murphy.

79. Msgr. Murphy called Capt. Smith later that day and informed him that the material was contained on a flash drive and that the Ratigan computer had been destroyed. Msgr. Murphy did not relate that it had been the plan by the Defendants to take as long as possible to produce the Ratigan computer to the police in order to destroy it before it could be

13

Case 4:11-cv-00957-GAF    Document 1    Filed 09/22/11    Page 13 of 19

produced to police.

80. The police subsequently arrived at the Chancery and picked up the flash drive, as it was the best remaining information available, the other information on the laptop having been successfully destroyed through the deliberate planning and careful steps to mislead effectuated by the Defendants.

81. Defendants produced no other computer images to police besides the flash drive on that date.

82. After the child pornography of Plaintiff Jane Doe 186, as well as a number of other girls, was turned over to law enforcement, Defendant Ratigan was arrested on three counts of possessing child pornography.

83. In May 2011, law enforcement searched a computer owned by Defendant Diocese which was located at St. Mary parish in St. Joseph, Missouri and found child pornography of Plaintiff Jane Doe 186, as well as a number of other girls.

84. In May 2011, law enforcement served a search warrant on family members of Defendant Ratigan and found additional child pornography of Plaintiff Jane Doe 186, as well as a number of other girls, that were stored on compact discs.

85. Child pornography of Jane Doe 186 has been knowingly received and distributed by Defendants.

86. Defendants have collaborated and coordinated with each other and with agents and third parties to destroy evidence of the receipt and distribution of child pornography.

87. Plaintiffs have each been damaged as described herein as a result of the sexual abuse, production, distribution, receipt and viewing of the child pornography of the minor Plaintiff.

88. As a direct and proximate result of the actions and inactions of the Defendants, Plaintiffs have suffered, and will continue to suffer, severe emotional distress, fear for safety, shock, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life, have been prevented and will continue to be prevented from performing normal daily activities and obtaining the full enjoyment of life, will sustain income loss and loss of earning capacity and has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

### COUNT I: PRODUCTION OF CHILD PORNOGRAPHY IN VIOLATION OF 18 U.S.C.A. §§ 2251 AND 2255
### (AGAINST DEFENDANT RATIGAN)

89. Plaintiff Jane Doe 186 incorporates allegations above as if fully stated.

90. Defendant Ratigan used and employed minor Plaintiff Jane Doe 186 to engage in sexually explicit conduct of which Defendant Ratigan produced numerous visual depictions and photographs.

91. Defendant Ratigan knew or had reason to know that such visual depiction would be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, and/or that the visual depiction was produced or transmitted using materials that have been mailed, shipped or transported in or affecting interstate or foreign commerce by any means, including a computer.

92. Defendant Ratigan's acts violated 18 U.S.C.A. §§ 2251(a) and 2255.

93. As a direct and proximate result of Defendant Ratigan's violations described herein, Plaintiff Jane Doe 186 has suffered and will continue to suffer the damages described herein.

15

Case 4:11-cv-00957-GAF   Document 1   Filed 09/22/11   Page 15 of 19

### COUNT II: SEXUAL EXPLOITATION OF A CHILD VIOLATION OF 18 U.S.C.A. §§ 2251 AND 2255
### (AGAINST DEFENDANT RATIGAN)

94. Plaintiffs incorporate allegations above as if fully stated.

95. From approximately 2006 to 2010, Defendant Ratigan engaged in unpermitted, harmful and offensive sexual conduct and contact upon the person of Plaintiff Jane Doe 186.

96. Defendant Ratigan's acts violated 18 U.S.C.A. §§ 2251 and 2255.

97. Pursuant to 18 U.S.C.A. § 2259, Plaintiffs Mother Doe 186 and Father Doe 186 are each entitled to recover damages including medical expenses that were paid or will be paid for the treatment of Plaintiff Jane Doe 186 that were incurred as a result of the improper conduct described herein, as well as other damages authorized by law.

98. As a direct result of Defendants Ratigan, Diocese and Bishop Finn's improper conduct described herein, Plaintiffs Mother Doe 186 and Father Doe 186 have suffered and will continue to suffer the damages described herein.

### COUNT III: RECEIVING AND DISTRIBUTING CHILD PORNOGRAPHY IN VIOLATION OF 18 U.S.C.A. §§ 2252A AND 2255
### (AGAINST DEFENDANTS RATIGAN, DIOCESE AND BISHOP FINN)

99. Plaintiffs incorporate allegations above as if fully stated.

100. Upon information and belief, Defendants Ratigan, Diocese and Bishop Finn knowingly received and/or distributed sexually explicit visual depictions of the minor Plaintiff Jane Doe 186 engaged in sexually explicit conduct which constitutes child pornography.

101. Defendant Ratigan engaged in such conduct from 2006 to 2010.

102. Defendants Diocese and Finn engaged in such conduct from not less than 2010 to 2011.

103. Defendants knew or had reason to know that such visual depiction would be

16

Case 4:11-cv-00957-GAF   Document 1   Filed 09/22/11   Page 16 of 19

transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, and/or that the visual depictions were produced or transmitted using materials that have been mailed, shipped or transported in or affecting interstate or foreign commerce by any means, including a computer.

104. Defendants' acts violated 18 U.S.C.A. §§ 2252A and 2255.

105. Plaintiffs Mother Doe 186 and Father Doe 186 are each entitled to recover damages for medical expenses that were paid or will be paid for the treatment of Plaintiff Jane Doe 186 that were incurred as a result of the improper conduct described herein, and for other and further relief as is available by law, including 18 U.S.C.A. § 2259.

106. As a direct and proximate result of Defendants Ratigan, Diocese and Bishop Finn's violations described herein, Plaintiffs have suffered and will continue to suffer the damages described herein.

### COUNT IV: AIDING AND ABETTING THE RECEIPT OF AND DISTRIBUTION CHILD PORNOGRAPHY IN VIOLATION OF 18 U.S.C.A. §§ 2(a), 2252A AND 2255 (AGAINST DEFENDANTS DIOCESE AND BISHOP FINN)

107. Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

108. Defendants Diocese and Bishop Finn have separate liability as principals for the acts of Defendant Ratigan because Defendants Diocese and Bishop Finn aided and abetted Defendant Ratigan in his possession of child pornography of the minor Plaintiff Jane Doe 186 by (a) actively participating in the criminal conduct through protecting Fr. Ratigan from detection and (b) by concealing these acts from law enforcement, parishioners, students and other children who would necessarily come into contact with Defendant Ratigan, and (c) by enabling destruction of information about receipt and distribution through their handling of the Ratigan

17

Case 4:11-cv-00957-GAF   Document 1   Filed 09/22/11   Page 17 of 19

computer.

109. Plaintiffs Mother Doe 186 and Father Doe 186 are each entitled to recover damages for medical expenses that were paid or will be paid for the treatment of Plaintiff Jane Doe 186 that were incurred as a result of the improper conduct described herein, and for such other and further relief as is authorized by law, including 18 U.S.C.A. §2259.

110. Defendants' actions were willful, wanton or reckless for which punitive damages and/ or an award for aggravating circumstances are appropriate.

111. As a direct result of Defendants Ratigan, Diocese and Bishop Finn's improper conduct described herein, Plaintiffs have suffered and will continue to suffer the damages described herein.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues triable in this case.

WHEREFORE, Plaintiffs demands judgment against Defendants, jointly and severally as follows:

a. For a sum of money to fairly and adequately compensate Plaintiff Jane Doe 186 for her past and future emotional distress, pain and suffering, fear for safety, shock, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life, loss of the ability to perform her normal daily activities and obtaining the full enjoyment of life, loss of future income and earning capacity for and has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

b. For Plaintiffs Mother Doe 186 and Father Doe 186's costs incurred for medical and psychological treatment for Plaintiff Jane Doe 186, and for such other and further relief for

their own injuries, physical and psychological, as is authorized by law, including 18 U.S.C.A. § 2259;

      c.      For Plaintiffs' costs, disbursements and attorney fees as allowed by law; and

      d.      For such other and further relief as the Court deems just and equitable.

Dated: September 22, 2011.                    RANDLES, MATA & BROWN, L.L.C.

                                          s/Rebecca M. Randles
                                          Rebecca M. Randles, Mo. # 40149
                                          406 West 34th Street, Suite 623
                                          Kansas City, MO 64111
                                          (816) 931-9901

                                          Jeffrey R. Anderson
                                          Patrick W. Noaker, Mo. # 39836
                                          JEFF ANDERSON & ASSOCIATES, PA
                                          366 Jackson Street, Suite 100
                                          St. Paul, MN 55101
                                          (651) 227-9990

                                          Pro Hac Vice motions pending

                                          Attorneys for Plaintiffs